## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**SHAQUILLE HANKERSON** | Crim. No. 21-418 (KM)<br><br>**OPINION & ORDER** |

Defendant Shaquille Hankerson is accused in a Superseding Indictment of one count of possession of a firearm by a felon, one count of possession with intent to distribute fentanyl, and one count of possession of a firearm in furtherance of a drug trafficking crime. (DE 24.) He filed a motion (DE 19) to suppress evidence consisting of narcotics and firearms which were seized from his automobile on the night of September 22, 2020. After briefing was complete (*see* DE 20, 21, 22), the Court convened an in-person evidentiary hearing on October 5, 2021. (*See* Transcript ("Tr.") (DE 26).) For the reasons stated herein, the motion is denied.

### FACTS

### A. Det. Maldonado testimony and exhibits

At the suppression hearing, the government called one witness, Detective Michael Maldonado.[1] On September 22, 2020, Maldonado, was patrolling the Sixth Precinct in Newark, New Jersey, tasked with enforcement of narcotics and weapons laws, quality of life offenses, motor vehicle violations, as well as city ordinances. (Tr. 10–11.) He drove an unmarked car, with Officer

---

[1]     At the time of the events, Maldonado was a police officer; he was promoted to the rank of detective only thereafter. He has been with the police force for about seven years. (Tr. 10, 56.)

Christopher Donker and Officer Michael Perez as passengers; Officer Daniel Mendez drove a second car. Although wearing plainclothes, Maldonado had a badge around his neck. (Tr. 12–13.) At about 8:20 pm, Det. Maldonado was driving southbound on Salem Street, a one-way street. (Tr. 13.)

Salem Street is a residential street that intersects with a commercial thoroughfare, South Orange Avenue. Det. Maldonado was very familiar with Salem Street; it was part of the territory which he had recently patrolled every working day for a six-month period. (Tr. 14.) In that time, he had fielded many complaints from area residents about narcotics, firearms, shootings and overdoses. He estimated that he had made some 50 arrests as a result of those complaints, mostly for narcotics, but some for firearms. (Tr. 15.)[2]

On September 22, 2020, at 8:20 pm, it was dark.[3] The weather was clear, and the area in question was well lit with street lights. (Tr. 15–16.) Daytime photographs were introduced in evidence to show the layout of the street and the position of the street lights. (G Exs. 1, 1a, 2, 2a; Tr. 15–22.) A third photograph showed that, in addition to the street lights, there were two similar lights in the adjoining Wells Fargo Bank parking lot. (G Ex. 3a; Tr. 23–24.)[4]

Det. Maldonado was driving south on Salem Street at about 5–10 mph— slowly, because he was patrolling. His window was open on the driver's (left) side. He passed a silver Hyundai Santa Fe to his left, just a few feet away. The Hyundai was parked and facing south. (Tr. 13.) The engine appeared to be running, but the lights were turned off. (Tr. 15.) The Hyundai was parked

---

[2]     On cross-examination, Maldonado acknowledged that, although this is a high crime area, in his opinion the majority of residents are surely law-abiding. (Tr. 60–61)

[3]     Sunset would have been at approximately 6:52 pm. https://www.timeanddate.com/sun/usa/newark?month=9&year=2020

[4]     There is a Crime Scene unit photograph of the car, taken on the night of the incident. (G Ex 5) It does not accurately depict the exterior lighting conditions, however, because it is a flash photo, which will naturally darken the area surrounding the subject of the photo. (Tr. 67–68)

blocking a commercial driveway for a Wells Fargo Bank. (Tr. 13, 25–26; *see also* G3, 3a (photographs showing location of the parked car and driveway.)) Although the bank itself was closed, the ATM was open, and the driveway provided 24-hour access. (Tr. 59–60.)

Passing the Hyundai, Det. Maldonado saw Mr. Hankerson "with his head against the steering wheel as if he were asleep." (Tr. 26.) From his experience, Maldonado knew that narcotics purchases and use were common in that area; he was familiar with approximately 50 local instances in which purchasers immediately ingested the drugs; and he knew of overdoses that had occurred in that area. (*Id.*)[5] Det. Maldonado pulled one to two car lengths ahead of the Hyundai and stopped. The second car, driven by Officer Mendez, stopped just behind him.

Det. Maldonado got out of his car and walked back toward the Hyundai. Initially, he shone his flashlight into the front windshield. (Tr. 27.) He could clearly see Mr. Hankerson, who popped his head up in response. Hankerson moved in a manner that suggested he was shuffling items, but from looking through the windshield, the officer did not have a clear view of what Hankerson was doing. (Tr. 28, 63.) Maldonado proceeded to the driver's side window. Hankerson lowered the window and put his hands on the steering wheel. Maldonado asked Hankerson for his credentials. (Tr. 29.) Mr. Hankerson retrieved the license and registration from the glove box, and his driver's license from the wallet in his pocket. (Tr. 31.)

---

[5]     On cross-examination of Det. Maldonado, defense counsel pursued the theory that Mr. Hankerson had pulled over to look at his phone, as a good citizen should. Maldonado denied this, stating that he would have seen the glow from the screen. (Tr. 61–63.) As it turned out, Mr. Maldonado stated in his own testimony that he had *not* been looking at his phone. (Tr. 112)

Defense counsel also elicited from Maldonado that his police report stated that Hankerson's head was down, but the report did not specifically state that his head was contacting the steering wheel. (Tr. 62.) I give no great weight to this minor omission. Cross-examination also emphasized that Mr. Hankerson remained peaceful and cooperative, which was not contested. (Tr. 64–65)

At about this time, Det. Maldonado saw an orange pill bottle in the cup holder, located in the console to the right of the driver's seat where Hankerson was sitting.[6] It was a blank, orange pill container with a white top, of the type used to dispense prescription drugs. It had no label. (Tr. 31.) Maldonado could see that inside the bottle, there was a white powdery residue, along with several "small items." (Tr. 31–32.) He asked Hankerson to get out of the car so he could inspect the contents of the bottle, which he did not believe were legally prescribed to Hankerson. Maldonado did so because, based on his experience with some one hundred narcotics investigations, he knew that narcotics offenders commonly store and package CDS in prescription-style pill bottles without labels. (Tr. 32)

Throughout this process, Det. Maldonado continued to shine his flashlight into the car. He could clearly see the front compartment. (Tr. 32.) Hankerson complied with the order to get out of the car. (Tr. 32, 36.)

Det. Maldonado retrieved the pill bottle from the cup holder and took custody of it. The pill bottle was approximately half filled with small white pills that had engraving on them, and confirmed his earlier observation that it had a white residue inside. (Tr. 33, 36) (The pill bottle, emptied of its contents, was introduced as G Ex. 21. (Tr. 35).) Shortly afterward, Mr. Hankerson was placed under arrest and was handcuffed by Officer Donker. (Tr. 36, 77–78.) A cell phone and $542.75 in currency were retrieved from his person. (Tr. 37)

Det. Maldonado then searched the interior of the car. In the top-level compartment of the center console, he found a handgun magazine loaded with 10 rounds. From the lower-level compartment of the console he retrieved a small package of raw marijuana and two small plastic bags containing pills similar to those in the bottle. (Tr. 38, 41–42.) At the time, Officer Maldonado

---

[6]     On cross-examination, Det. Maldonado clarified that the car's headlights, tail lights, and interior lights were all off. The street lights nevertheless provided ample lighting, in addition to his flashlight, to permit him to see the pill bottle. (Tr. 66–67.)

believed the pills resembled oxycodone. (They later turned out to be fentanyl.) (Tr. 73–74).)

Some 30 to 40 minutes after the search, the Crime Scene Unit arrived and took photographs. Det. Maldonado clarified that at this time, the pill bottle had already been removed from the car and was in his possession. (Tr. 54.) Det. Maldonado explained that the Crime Scene Unit would be called in to document weapons recoveries, but not narcotics recoveries. (Tr. 54.) He also explained that, having already impounded the pill bottle, it would have been improper for him to place it back in the cup holder for the purpose of being photographed. (Tr. 80.) In general, the Crime Scene photographs document the condition of the car and its contents sometime after the search, not at the time of the stop and arrest.

One of the photographs taken by the Crime Scene unit (G Ex. 7) shows the handgun magazine in the top console compartment, which is propped open. It also depicts the cup holder, which had two adjacent openings for cups, in a figure 8 configuration. Maldonado marked the location of the pill bottle with an X, in the cupholder opening farther from the driver. (G Ex 7a.) Both of the cupholder openings appear to contain a significant amount of loose change. At the time that the Crime Scene Unit took photographs, the bags containing pills and marijuana had been removed from the console and were lying on the driver's seat, where they appear in another photo. (G Ex 6; Tr. 44–46.)

Officer Donker searched other areas of the car. From the spare tire compartment beneath the rear luggage compartment of the car, accessible through the hatchback, he recovered an assault rifle. The rifle had one round in the chamber and a detached extended magazine containing 25 rounds. (Tr. 47–53; *see also* G Ex 8 (Crime Scene photo of rear compartment); G Ex 9 (photo of spare tire compartment containing assault rifle); G 10 (photo of assault rifle and ammunition).)

### B. Shaquille Hankerson testimony and exhibits

Mr. Hankerson testified at the hearing. (Tr. 84)

At the outset, he acknowledged his criminal record. On April 30, 2010, he was convicted of distributing CDS within 1000 feet of a school, for which he received a probationary sentence. On February 7, 2011, he was convicted of possession of CDS with the intent to distribute, for which he received a sentence of 3 years' imprisonment with 18 months of parole ineligibility. On November 3, 2014, he was convicted of distributing CDS within 1000 feet of a school, for which he received a sentence of 2 years' imprisonment. In 2014, he was convicted in federal court of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g), for which he received a sentence of 70 months' imprisonment. At the time of the events charged in this case, he was on supervised release from that conviction. None of the prior convictions had involved an evidentiary hearing or a trial.[7] (Tr. 85–87, 117–19.)

Hankerson stated that on the night of September 22, 2020, he had dropped off a friend and was on his way to South Orange Avenue. He parked in front of the Wells Fargo driveway on Salem Street, about four or five car lengths from South Orange Avenue, because it was the first available space. The area was "not really" well lit. (Tr. 88.) He walked to a corner bodega at South Orange Avenue to purchase a Gatorade and a Black & Mild cigar, a process that took about seven minutes. When he returned to his car, the police were searching some five or six people on the street, some four car lengths in front of his car. (Tr. 89, 104–05.) He saw one police car, not two. (Tr. 106.) Because the police car was blocking the one-way street, he could not leave, so he sat in his car. After about a minute and a half, all of the officers approached his car, one of

---

[7] The intended implication was that Mr. Hankerson does not contest criminal proceedings routinely or as a matter of general principle, suggesting that his position on this motion is sincerely held. Given that each case is unique, and there was no evidence that the situations or legal issues in the prior cases were comparable, I considered that inference but gave it little weight.

them shining a flashlight. (Tr. 90–91, 107–09.) He was not asleep, and the engine was not running. As the officer initially shone the flashlight on his face through the windshield, Hankerson shaded his eyes with one hand and reached for the glove box, knowing the police would want his registration and proof of insurance. As Maldonado approached the driver's side window, Hankerson then turned the ignition key halfway, permitting him to open the driver's side window. (Tr. 90–91, 110.) He produced his credentials. Det. Maldonado opened the car door and told him to step out; when Mr. Hankerson asked why, Maldonado pulled him out of the car by his arm and an officer handcuffed him. (Tr. 92–93.) The police then searched the car.

Mr. Hankerson admitted that the drugs, the gun, and the ammunition had been in the car. He testified, however, that none of the items, including the orange pill bottle, were in plain view. (Tr. 94.) In particular, he said, the pill bottle was not in the cup holder, but was concealed in the bottom compartment of the console, with the other drug items. He testified that the handgun magazine was not in the top compartment of the console, but in the bottom compartment, with the narcotics. (Either way, however, it is conceded that the magazine would not have been in plain view.) (Tr. 95.) The two openings of the cup holder, he testified, had contained the Gatorade he had purchased (on the passenger side) and a cup holder ashtray (on the driver's side). (Tr. 95–97.) Those items, he implied, must have been removed from the cup holder and placed on the front seat before the Crime Scene Unit photos were taken.[8] (Tr. 96–98; G Ex 7.)

---

[8]     Det. Maldonado did not deny that the items somewhat unclearly depicted in the photos were in fact a cup holder ashtray and a bottle of Gatorade. He flatly denied, however, that the cup holder ashtray and Gatorade had occupied the two openings of the cup holder when he looked into the car. (Tr. 76–77.)

        A cup holder ashtray, as the name implies, is an insert that may be placed in a cup holder to contain ashes from smoking and permit them to be removed and disposed of easily. By its nature, it is a removable item. The presence of a generous amount of small change in the cup holder openings could be seen as inconsistent with

The defense introduced in evidence a demonstrative photograph of the defendant's father sitting in the driver's seat of the Hyundai. (D Ex 1; Tr. 98–102.) It was staged and taken some two months later by Hankerson's mother. (Tr. 114.) The father is leaning toward the glove box (as if to retrieve a registration), and the purpose of the photo was to demonstrate that Mr. Hankerson's body would have blocked Det. Maldonado's view of the cupholder where the pill bottle was allegedly found.[9]

---

the proposition that the cup holder ashtray was permanently or semi-permanently left in place. (*See* G Ex 7.) That inference is far from inescapable, however.

The Black & Mild cigar (a small cigar with a plastic mouthpiece) does not seem to appear anywhere in the exhibits (Tr. 106), and the Court is unable to discern any ashes in the photos. Neither side offered evidence that Mr. Hankerson was actually smoking at the time of the encounter.

[9]     On cross-examination, defense counsel elicited the admission from Det. Maldonado that the view of the cup holder would temporarily, for a "brief period," be obstructed by a person leaning over to access the glove compartment. (Tr. 75.) That Mr. Hankerson's father, in the demonstrative photograph, could assume a position that temporarily blocked a view of the cup holder is not particularly probative. (*See* D Ex 1.) Moreover, the government elicited that defendant's mother could have moved the position of the seat, and also that she is 5'3", so her angle of view might differ from that of Det. Maldonado. (Tr. 114–16.)

At any rate, it is undisputed that Mr. Hankerson *did* produce his identification from the glove compartment. At that point, he would no longer have been leaning to his right.

Det. Maldonado testified that Mr. Hankerson reached to retrieve his identification from the glove compartment in response to Maldonado's request. Hankerson insisted that he anticipated that request; when the officer initially shone the flashlight in his face, he held up one hand and, with the other, reached for the glove compartment to retrieve his ID (the idea being, perhaps, that he might already have been in a position to obstruct Maldonado's view of the cup holder when Maldonado walked around to the driver's side window). There is reason to question the plausibility of Hankerson's version. First, to speak to Maldonado, as Hankerson himself testified, he had to turn the ignition key and open the driver's side window; at that point he would not have been leaning to the right. Second, the defense elicited that Hankerson (inferably a veteran of police encounters) knew enough to keep his hands in view, on the steering wheel, to avoid escalating the encounter. (Tr. 64–65, 110.) Such a person would be unlikely to reach for the glove box, unbidden, as such a gesture could easily be misinterpreted.

Defense counsel elicited from Det. Maldonado that the pill bottle was standing up straight, rather than on its side. The police report, he noted, did not contain that

### C. Credibility findings

Det. Maldonado's version of the events was coherent and plausible. It was not significantly rebutted on cross examination. Patrolling this narrow street at 5-10 mph, he passed the Hyundai, which was just a few feet to his left. It makes sense that he would have noticed Mr. Hankerson bent over the steering wheel in a dark, (illegally) parked car, and investigated further. That he could readily see the orange pill bottle, particularly with the street lighting and the aid of a flashlight, does not strain credulity.

Mr. Hankerson, on the other hand, posits that four policemen were on an unconstitutional spree. While he was briefly inside the bodega, the police suddenly appeared and began frisking five or six pedestrians. Mr. Hankerson's account implies he walked past this scene, but for some reason was not stopped, like the other pedestrians. Once he was seated in his car, however, the officers together walked down the block to confront him; yanked him out of the car by his arm and handcuffed him for no reason; searched the car until they found concealed contraband; picked out one of many concealed items (the pill bottle), despite the presence of more obviously incriminating items; and then lied about the bottle's location to support a "plain view" theory. There is no corroboration in the form of an indication that these were rogue officers, and the victims of the alleged group stop-and-frisk have not been located. As noted, I found unpersuasive the evidence that Det. Maldonado would have been unable to see the cup holder.

Det. Maldonado's version has the edge in terms of general plausibility. Hankerson's description of the officers' behavior is not as convincing as Maldonado's logical and coherent account. That said, neither is Hankerson's

---

fact, and did not state which of the cup holder's two openings contained the pill bottle. (Tr. 70.) I give those omissions no great weight.

Mr. Hankerson, of course, is contending that the pill bottle was never in the cup holder in the first place. He seems to have offered this evidence in the alternative as impeachment of the officer's testimony.

account so implausible or fantastic that it may be disregarded. While it contains some less-than-convincing aspects, it was not shaken on cross-examination. And it was corroborated to the extent that the Gatorade and cupholder ashtray were seen in the interior photographs of the car. My acceptance of the detective's version is therefore significantly swayed by comparative considerations of witness credibility.

Det. Maldonado struck the court as a credible witness. He answered questions in a direct manner, without resorting to conclusory legal language, and did not embellish or "improve" his account in any obvious way.[10] He of course had a bias in the sense of an interest in vindicating his police work. There was, however, no indication of any other source of potential bias, and Hankerson had had no prior contact with the defendant. (Tr. 65.) Hankerson's version of the events was reported contemporaneously with those events, and it has remained consistent. If his version was false, to maintain that falsehood would have required the cooperation of at least three other officers.

Mr. Hankerson, too, answered questions in a direct manner. He was frank about his criminal past and his ownership of the incriminating items in the car. His account of the events, however, was not documented contemporaneously; he has had many months to retrofit his story to the photographic and other evidence. Mr. Hankerson is, of course, facing a very substantial sentence of imprisonment if convicted,[11] and therefore has a vital, personal interest in the outcome of the hearing. These factors of course do not prove fabrication, but they do establish an opportunity and a strong motive to color one's testimony. Mr. Hankerson also possesses a criminal record

---

[10]     And, assuming the police were fabricators, it would have been easy to come up with a scenario that was far more airtight from the perspective of search-and-seizure law.

[11]     In response to the government's elicitation of the maximum sentence of life, I permitted defense counsel to introduce the fact that Hankerson had rejected a plea offer entailing a recommendation of 84 to 105 months' imprisonment. (Tr. 120.) Either way, the potential exposure is quite significant.

encompassing multiple felonies, one involving an illegal firearm, and the rest narcotics. Again, I do not suggest that such a person can never be believed. But these convictions, too, I consider as strong impeachment of his current testimony, and the corroborative evidence is weak.

In short, the credibility balance tips in the government's favor, and I accept Det. Maldonado's version of the events.

## DISCUSSION

The government's Fourth Amendment theory is that the warrantless seizure of the orange pill bottle was justified because the bottle was observed in plain view by Det. Maldonado.[12]

> The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. *Texas v. Brown*, --- U.S.----, at ---- and n. 4, 103 S. Ct. 1535, at 1540 and n. 4, 75 L.Ed.2d 502 (plurality opinion); *id.*, at ----, 103 S. Ct., at 1544 (POWELL, J., concurring); *id.*, at ----, 103 S. Ct., at 1547 (STEVENS, J., concurring). The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.

*Illinois v. Andreas*, 463 U.S. 765, 771–72, 103 S. Ct. 3319, 3324 1003 (1983).[13]

The plain view issue presented to the Court by this motion requires that I answer three questions:

(a) Did Maldonado violate the Constitution in the process of arriving at his vantage point beside Hankerson's car?

(b) Was the pill bottle plainly visible from that vantage point?

---

[12]   The challenge is focused on that initial encounter. There is no dispute that, if the seizure of the pill container was valid, the car search that followed was permissible.

[13]   The citation in the quotation is to *Texas v. Brown*, 460 U.S. 730, 739–40, 103 S. Ct. 1535, 75 L.Ed.2d 502 (1983), which had not yet been officially reported.

(c) Was the incriminating character of the pill bottle immediately apparent?[14]

I consider those questions in the corresponding sections, a, b, and c, below.

### a. The investigative detention of the Hyundai and Mr. Hankerson

The prerequisite to a valid "plain view" search is that the officers did not violate the Constitution in arriving at their vantage point. For example, the fruits of a "plain view" observation may be suppressed if officers violated an expectation of privacy by trespassing on the curtilage of a home. *See United States v. Dunn*, 480 U.S. 294, 304, 107 S. Ct. 1134 (1987); *see also Illinois v. Andreas*, 463 U.S. at 771 ("Of course, if the police officers' presence in the home itself entailed a violation of the Fourth Amendment, no amount of probable cause to believe that an item in plain view constitutes incriminating evidence will justify its seizure.") (quoting *Soldal v. Cook County, Ill.*, 506 U.S. 56, 66 n. 10, 113 S. Ct. 538 (1992)). Likewise, evidence in "plain view" within an automobile may be suppressed if the officer was in a position to observe it only by virtue of having conducted an illegal stop of the automobile. *See United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) ("Thus passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits . . ."); *United States v. Brown*, No. CRIM. 06-867 (JHR), 2008 WL 4757311, at *2 (D.N.J. Oct. 27, 2008) (suppressing a firearm seized from an automobile in plain view because the police had lacked reasonable suspicion for the automobile stop).

Initially, the government took the position that Det. Maldonado's approach to Mr. Hankerson's car did not implicate the Fourth Amendment at all. This approach, they said, was analogous to an officer's walking up to a pedestrian, who is free to leave, and asking some questions.[15] Ink has been

---

[14]    I distill these three issues from my exchange with defense counsel at the close of the hearing, after summations. (Tr. 128–29.)

[15]     "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other

spilt on the distinction between a vehicle stop, which is a seizure, and a mere investigative approach to a person who happens to be occupying a vehicle, which is not. The distinction may depend on a number of facts, including the officers' show of force, obstruction of travel, a demand that the driver turn off the engine, and so forth. *Compare United States v. Hester*, 910 F.3d 78, 87–88 (3d Cir. 2018) (boxing in parked vehicle with police cars and approaching on foot was a seizure requiring reasonable suspicion) *and United States v. Edwards,* 53 F.3d 616, 617 (3d Cir. 1995) (boxing in occupied vehicle with three police cars, followed by officers approaching on foot with a police dog, constituted a seizure), *with United States v. Williams*, 413 F.3d 347 (3d Cir. 2005) (parking police cars twelve or thirteen feet away and then approaching persons unloading a parked van was not a seizure)).

Here, however, there clearly was a seizure of the car and driver, running from the time that the officers parked ahead of the Hyundai.[16] When driving slowly down Salem Street, Det. Maldonado immediately noticed the parked but occupied Hyundai. Both police cars pulled ahead of the Hyundai and stopped in a position that would obstruct the Hyundai from traveling forward. Physically blocked by a police car in the only permissible direction of travel on a one-way street, with officers approaching on foot, Mr. Hankerson could not have felt that he was free to go. *See generally Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382 (1991); *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975 (1988). I therefore treat this encounter as a seizure, more analogous to a highway traffic stop than to a consensual encounter between a police

---

public places." *United States v. Drayton*, 536 U.S. 194, 200, 122 S. Ct. 2105, 153 L.Ed.2d 242 (2002); *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions.").

[16]     Absent unusual circumstances, the seizure of an automobile would necessarily constitute a seizure of its occupants as well. *Mosley*, 454 F.3d at 253.

officer and a pedestrian. To that extent, I rule in the defendant's favor; the standards of the Fourth Amendment do govern this stop.[17]

To sustain the search, then, it is first necessary to find that the officers had a legitimate basis for an investigative detention of Hankerson in the brief interval preceding their discovery of contraband. Such a limited investigative stop requires a reasonable suspicion of criminal activity:

> We determine whether reasonable suspicion existed to support a stop under an objective standard and a totality of the circumstances approach. *See* [*Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868 (1968)]; *Brown*, 448 F.3d at 246-47. That is, we consider whether "a reasonable, trained officer standing in [the detaining officer's] shoes could articulate specific reasons justifying" the stop. *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003); *see also United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981). The "subjective intentions" of the officers do not factor into our analysis. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996); *see also United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006).

*United States v. Hester*, 910 F.3d 78, 87 (3d Cir. 2018).

The prosecution suggested two bases which, alone or in combination, justified a brief, *Terry*-style investigative detention short of arrest.[18]

*First,* there is the basis stressed by Det. Maldonado in his testimony. Driving slowly down the block on patrol, he noticed Mr. Hankerson in a stopped car with the lights off but the motor running. The Hyundai was mere feet away from his driver's side window. Inside the Hyundai, Hankerson was

---

[17]   Ironically, my acceptance of the government's version of the facts requires that I reject its legal position on this issue; Mr. Hankerson's version might have presented a closer question, if not a different result. Hankerson testified that the police had stopped their car on Salem Street in connection with searching some pedestrians, and that, as a consequence, their car would have blocked a hypothetical attempt to drive down the block to South Orange Avenue. Meanwhile, he was in his car, which was parked, with both the lights and the engine off.

[18]   I say "*Terry*-style" because *Terry* itself involved a highly intrusive detention and physical pat-down of a suspect, not the blocking of a car's progress.

slumped over, with his head on the steering wheel, as if asleep.[19] Maldonado was intimately familiar with this neighborhood and knew it to be a high crime area. This knowledge was not based on some general impression, but on his having regularly patrolled the area for at least six months and engaged in investigation of many offenses, most involving drugs and some involving firearms. In particular, he personally was familiar with approximately 50 local instances in which purchasers immediately ingested the drugs they bought *in situ,* and he knew of overdoses that had occurred in that area.

It was on this basis that Det. Maldonado parked ahead of the Hyundai—the first act that could be regarded as a seizure— and walked back to investigate. He asked Hankerson to identify himself, and Hankerson produced his license, insurance, and registration. Almost immediately, Det. Maldonado spotted the orange pill bottle in the cup holder. The process, as described, could not have occupied more than a minute or two.

I find that Det. Maldonado possessed sufficient facts to support a finding of reasonable suspicion that would justify a brief detention of Mr. Hankerson and his car:

> Among the factors we consider, "[t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors [including, inter alia] specialized knowledge and investigative inferences ... [as well as] personal observation of suspicious behavior." *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (quoting *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002)). Sub-factors that indicate suspicious behavior include the suspect's "[p]resence ... in a high crime area[,]" "presence on a street at a late hour," and behavior "that conforms to police officers' specialized knowledge of criminal activity." *Id.* at 251 (internal quotation marks and citations omitted). Although we evaluate each factor "in turn," the relevant analysis is whether an officer would have reasonable

---

[19]     There is no legal challenge to the validity of this initial observation, which took place on a public street and did not involve any detention or seizure of the Hyundai or Mr. Hankerson. Rather, Mr. Hankerson disputed that it had occurred, contending instead that the officers had already parked their car and were frisking pedestrians.

suspicion given the "the whole picture." *Id.* at 247. Thus, even if any factor alone would be insufficient to support reasonable suspicion, the relevant factors, taken together, could nonetheless suffice.

*Hester*, 910 F.3d at 87.

Given the character of Salem Street area and his experience with drug use and overdoses in that area, Officer Maldonado could permissibly have entertained a reasonable suspicion that a person slumped over the steering wheel in a dark automobile with the engine running was involved in narcotics-related activity. A brief detention to follow up with some investigation was justified.[20]

*Second,* there was a reasonable basis to briefly detain the car and investigate because the Hyundai was parked illegally. Officer Maldonado, in his testimony, stated that his duties included investigation of quality of life and motor vehicle offenses. He did not, however, highlight illegal parking as a basis for investigating the Hyundai and its occupant. (This makes sense, as he already suspected he had bigger fish to fry.) As noted above, however, the reasonable suspicion test does not depend on the "subjective intentions" of the officers. *Whren,* 517 U.S. at 813. Rather, it is an objective test: whether a hypothetical "reasonable, trained officer" in that situation "could articulate specific reasons justifying" a stop. *Johnson v. Campbell*, 332 F.3d at 206.

The Hyundai was parked so as to block the driveway to the Wells Fargo Bank—that is to say, illegally:

---

[20]   Alternatively, the officers could have thought that Mr. Hankerson was in need of assistance, whether or not as a result of illegal drug use. *See generally Vargas v. City of Philadelphia*, 783 F.3d 962, 971-72 (3d Cir. 2015) (holding that seizure was reasonable under the "community caretaking" doctrine where police officers, responding to a report of screaming individuals, blocked and ordered everyone out of plaintiff's automobile); *Hartman v. Gloucester Twp.*, No. CIV.A. 12-2085, 2014 WL 2773581, at *8 (D.N.J. June 19, 2014) ("[T]he community caretaking function permits the police limited access without a warrant to motor vehicles ... to ensure the wellbeing of the community.") (citing *Ray v. Twp. of Warren*, 626 F.3d 170, 177–78 (3d Cir. 2010)). In response to questioning, counsel for the government suggested that this could be regarded as a stop to ensure Mr. Hankerson's "well-being." (Tr. 126)

> Except when necessary to avoid conflict with other traffic or in
> compliance with the directions of a traffic or police officer or traffic
> sign or signal, no operator of a vehicle shall stand or park the
> vehicle in any of the following places: . . .
>
> d. In front of a public or private driveway; . . .

N.J. Stat. Ann. § 39:4-138.

It is well established that police officers may perform investigatory traffic stops based on reasonable suspicion that "an individual has violated the traffic laws." *United States v. Delfin–Colina*, 464 F.3d 392, 397 (3d Cir. 2006). That principle extends to quite minor violations.[21] The U.S. Court of Appeals for the Third Circuit has not definitively stated, however, whether such reasonable suspicion must be based on a moving violation, or may be based on a parking violation alone. *See Hester,* 910 F.3d at 88. At least four other Courts of Appeals have held that a parking violation will suffice,[22] and I agree.

---

[21]   *See United States v. Richardson*, 504 F. App'x 176, 179 (3d Cir. 2012) (reasonable suspicion justified pulling over car with defective rear center brake light, an infraction punishable only by a fine); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771, 121 S. Ct. 1876, 1878 (2001) (reasonable suspicion stop based on speeding, improperly tinted windshield, punishable only by fine); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001) (failure to fasten seatbelts of driver and children);

[22]   Flores's car was parked on the wrong side of a two-way street, which is a violation of Texas law. *See* Tex. Transp. Code Ann. § 545.303(a) (Vernon 1999). Kalina therefore had authority to detain her. *Cf. Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Whether he was actually motivated to detain her for other reasons is irrelevant. *See id.* at 813, 116 S. Ct. 1769.

*Flores v. City of Palacios*, 381 F.3d 391, 402–03 (5th Cir. 2004).

> Whether *Whren* applies to parking violations under California's civil-administrative enforcement scheme is a matter of first impression in this court. We conclude that it does and that, here, the parking violation justified the investigatory stop of Alvarado's vehicle. In so holding, we note that our conclusion is consistent with the decisions of our sister circuits that have considered *Whren*'s application to parking violations. *See Flores v. City of Palacios*, 381 F.3d 391, 402-03 (5th Cir. 2004); *United States v. Copeland,* 321

17

Either way, however, a parking violation may go into the mix of information that supports reasonable suspicion. Indeed, *Hester* did not need to consider the effect of a parking violation standing alone because it specifically endorsed the district court's consideration of a parking violation as one factor among others. *See id.* (parking violation "was merely one factor among many at issue, and we do not today address whether a mere parking violation would be sufficient to support reasonable suspicion.") Those factors in *Hester* were that "the officers observed a vehicle illegally idling near a crosswalk, in front of a store with a known history of narcotics-related activity, close to midnight, in a high-crime area of Newark." *Id.* at 87–88. The parking violation In Hankerson's case occurred in a similar, though not identical, setting of potential criminal activity, as outlined above.

The parking violation, then, may furnish an independent basis for reasonable suspicion. Alternatively, the parking violation may be combined with the prior, narcotics-related basis, to contribute to the totality of circumstances underlying the officer's reasonable suspicion.

In sum, the sequence of events that brought Officer Maldonado to the vantage point from which he saw the orange pill bottle did not involve any violation of the Constitution.[23]

---

F.3d 582, 594 (6th Cir. 2003); *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999).

*United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006)

[23]     I have held that the automobile stop, running from the officers' blocking of the street to Maldonado's initial observation of the contraband, was permissible at the outset. There is considerable case law concerning the permissible scope of a traffic stop, whether measured in time or intrusiveness. *See, e.g., Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609 (April 21, 2015) (continuation of stop after investigation had run its course without discovery of further criminal evidence); *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330 (1977) (driver may be ordered out of car during traffic stop); *United States v. Clark,* 902 F.3d 404 (3d Cir. 2018). The parties have not presented any substantial argument on the issue of whether the stop, assuming it was permissible at the outset, was impermissibly extended or expanded.

### b.   Orange pill bottle in plain view

Even in the absence of a warrant, perception of an object in plain view from a lawful vantage point does not constitute an unlawful search. *See, e.g., Horton v. California*, 496 U.S. 128, 130, 110 S. Ct. 2301 (1990) (officer executing a search warrant for cash was entitled to seize weapons that were in plain view). As relevant here, the U.S. Supreme Court has held that an officer executing a lawful traffic stop at night was entitled to seize items that were in plain view on the front seat when he shone his flashlight into the car. *Texas v. Brown*, 460 U.S. 730, 739–40, 103 S. Ct. 1535 (1983).

These legal principles are not in dispute; the challenge is a factual one. The defense denies that Det. Maldonado did in fact view the orange pill bottle as he claimed. It offered evidence intended to suggest that the bottle was not in the cup holder, or that Hankerson's presence in the driver's seat obstructed any view of the cup holder. For the reasons expressed above, however, I have found the facts otherwise. While standing at the open driver's side window of the Hyundai, Det. Maldonado saw an orange pill bottle in the cup holder to the right of the driver's seat where Hankerson was sitting. While he had the benefit of his flashlight, the bottle was in fact visible with the street lights alone.

Applying the law to these facts, I find that the pill bottle was in plain view from Det. Maldonado's lawful vantage point on a public street, following a legitimate investigative stop.

### c.   Incriminating character of the evidence apparent at the time

To justify a warrantless search or seizure, "not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136, 110 S. Ct. 2301, 2308 (1990).

A highly illustrative case is *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987). There, officers were lawfully in an apartment conducting an emergency search for a weapon. While in the apartment, an officer spotted expensive stereo equipment which seemed out of place with the surroundings. He moved a turntable so he could see the serial number, which he later

checked against records of stolen goods. The government invoked the "plain view" exception. Justice Scalia, writing for the Court, noted that the turntable was in plain view, but its serial number was not; that required lifting the turntable and looking at the back or underside—a search. *See id. at* 325 ("But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy ....") Having a suspicion, but not probable cause, to think the turntable was stolen, the officer was not permitted to search it any further. The plain view exception did not apply because the incriminating or evidentiary value of the turntable was not immediately apparent from what the officer, without further searching, could see.

In short, the officer's plain-view observations must constitute "probable cause to associate the property with criminal activity," *Texas v. Brown*, 460 U.S. 730, 738, 103 S. Ct. 1535 (1983) (plurality opinion) (quoting *Payton v. New York*, 445 U.S. 573, 586–587, 100 S. Ct. 1371 (1980)). The probable-cause test, it must be remembered, embodies a "practical and common-sensical" standard. *Florida v. Harris*, 568 U.S. 237, 244, 133 S. Ct. 1050, 1055, 185 L. Ed. 2d 61 (2013). It does not require "proof beyond a reasonable doubt, or by a preponderance of the evidence." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S. Ct. 2317 (1983)). The officer's belief need not necessarily be correct or more likely true than false." *Brown,* 460 U.S. at 742. All that is required is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Id.* (quoting *Gates*, 462 U.S. at 238, 231). A police officer has probable cause when "the facts available to [him] would 'warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." *Id.* (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280 (1925)).

Cases factually on point tend to be state court cases, because these are state-law offenses. *See, e.g., State v. Sidorek*, No. A-2877-13T4, 2014 WL

11264780, at *4 (N.J. Super. Ct. App. Div. Apr. 15, 2016) (finding probable cause under the plain view exception to open a prescription pill bottle and examine its contents where the bottle was not prescribed to the defendant); *State v. Jones*, No. A-3871-17T1, 2019 WL 2484698, at *4 (N.J. Super. Ct. App. Div. June 14, 2019) (finding probable cause based on officer's plain view observation of loose tobacco and a prescription pill bottle not prescribed to the defendant).

Federal case law, while not precisely on point factually, supports the same result. An officer may seize an item contained in packaging which, in his or her experience, is commonly used for illegal drugs. *See Texas v. Brown*, 460 U.S. 730, 739–40, 103 S. Ct. 1535 (1983) (during traffic stop, officer permissibly seized knotted opaque balloon containing heroin, based on officer's belief, based on experience, that illegal narcotics were frequently packaged in that manner); *United States v. Thomas*, 138 F. App'x 759, 761–62 (6th Cir. 2005) (finding that officers can rely on their experience and the nature of the object in determining whether an item is contraband). As always, however, an assessment of probable cause may take into account the totality of the circumstances.

Here, Officer Maldonado spotted an orange plastic container of a type commonly used to fill prescriptions. I take judicial notice that when such a bottle is used to dispense prescribed medicine, it will have a label identifying its contents as such. This bottle did not. It was a prescription-style pill container, orange and semi-transparent, with a white cap, and no label. (Tr. 31.) Maldonado could see that inside the bottle, there was a white powdery residue, along with "small items."[24] (Tr. 31–32, 35; G Ex. 21.) Based on his experience with some one hundred narcotics investigations in this geographic area,

---

[24]     Here, Det. Maldonado was seemingly being careful not to overstate. I gather that he could not positively identify the small items as pills from where he was standing. Still, it is not too far a leap to infer that a prescription pill container contained prescription pills, and he could see that it did not have a prescription label.

Maldonado knew that narcotics offenders commonly store and package CDS in prescription-style pill bottles without labels. (Tr. 32.) This observation, moreover, occurred under suspicious circumstances. Maldonado spotted the bottle next to Mr. Hankerson, who had been sitting slumped over the steering wheel in a running but darkened car, on a block where, Maldonado knew, individuals frequently dealt in and ingested illegal drugs. *See generally Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

Det. Maldonado thus had probable cause to believe that the pill bottle was evidence of a crime or contraband under state law. *See* N.J. Stat. Ann. § 2C:35-10.5(e)(1) (possession of prescription legend drug unless lawfully prescribed); N.J. Stat. Ann. § 2C:35-24 (possession of prescribed CDS not in container in which it was dispensed). That provided sufficient basis for a seizure and search, which quickly yielded further and more specific evidence.[25]

The requirements of the plain view exception to the warrant requirement are therefore met.

---

[25]    The government's briefing contained additional argument to the effect that, following the seizure of the prescription bottle, the officers possessed probable cause to search his person and the automobile, pursuant to the so-called "automobile exception." The defense did not contest the point in the briefing or at oral argument, and I do not discuss it.

## ORDER

For the foregoing reasons,

IT IS, this 15th day of October, 2021,

ORDERED that the motion to suppress evidence (DE 19) is DENIED.

/s/ Kevin McNulty

_____

**KEVIN MCNULTY, U.S.D.J.**